1   THOMAS R. BURKE (CA Bar No. 141930)
        thomasburke@dwt.com
2   DAVIS WRIGHT TREMAINE LLP
    50 California Street, 23rd Floor
3   San Francisco, California 94111
    Telephone: (415) 276-6500
4
    AMBIKA KUMAR (*pro hac vice*)
5       ambikakumar@dwt.com
    DAVIS WRIGHT TREMAINE LLP
6   920 Fifth Avenue, Suite 3300
    Seattle, Washington 98104
7   Telephone: (206) 757-8030
8   ADAM S. SIEFF (CA Bar No. 302030)
        adamsieff@dwt.com
9   DAVIS WRIGHT TREMAINE LLP
    865 South Figueroa Street, 24th Floor
10  Los Angeles, California 90017
    Telephone: (213) 633-6800
11
12  Attorneys for Plaintiff
    YELP INC.
13
14
15              IN THE UNITED STATES DISTRICT COURT
16              THE NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
17
18  YELP INC.,                          Case No.  3:23-cv-04977-TLT
19              Plaintiff,
                                        **NOTICE OF MOTION FOR**
20      v.                              **PRELIMINARY INJUNCTION AND**
                                        **MEMORANDUM OF POINTS AND**
21  KEN PAXTON, ATTORNEY GENERAL        **AUTHORITIES IN SUPPORT**
    OF THE STATE OF TEXAS,
22  in his official capacity,           Date:    November 7, 2023
                                        Time:    9:00 AM
23              Defendant.              Dept.:   Courtroom 9
24                                      Action Filed: September 27, 2023
25
26
27
28

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

    A.    Yelp's Efforts to Deter Misleading Information about Entities Offering
        Pregnancy-Related Services. ................................................................... 2

    B.    Attorney General Paxton's Efforts to Silence Yelp. ................................ 4

III.   LEGAL STANDARD ......................................................................................... 6

IV.   YELP WILL PREVAIL ON THE MERITS ....................................................... 6

    A.    The First Amendment Bars Punishing Truthful Speech of Public Concern. .......... 6

    B.    The Attorney General's Retaliatory Suit Violates the First Amendment. ............ 10

    C.    Yelp Has Not Violated the Texas Deceptive Trade Practices Act. ....................... 12

V.    YELP WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF ...... 13

VI.   EQUITY AND THE PUBLIC INTEREST FAVOR IMMEDIATE RELIEF ................. 13

VII.  CONCLUSION .................................................................................................. 14

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996) ........................................................................................... 10

5

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004) ........................................................................................... 13

6

7

*Assoc. Press v. Otter,*
   682 F.3d 821 (9th Cir. 2012) .............................................................................. 13

8

9

*Bartnicki v. Vopper,*
   532 U.S. 514 (2001) ........................................................................................ 6, 7

10

*Bradford v. Vento,*
   48 S.W.3d 749 (Tex. 2001) ................................................................................ 13

11

12

*Brennan v. Stewart,*
   834 F.2d 1248 (5th Cir. 1988) .............................................................................. 9

13

14

*Bullfrog Films, Inc. v. Wick,*
   847 F.2d 502 (9th Cir. 1988) .............................................................................. 12

15

*Cmty. House, Inc. v. City of Boise,*
   490 F.3d 1041 (9th Cir. 2007) ............................................................................ 13

16

17

*Dena' Nena' Henash, Inc. v. Oracle Corp.,*
   2007 WL 1455905 (N.D. Cal. May 16, 2007) ...................................................... 9

18

19

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022) ......................................................................................... 4

20

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
   907 S.W.2d 472 (Tex. 1995) .............................................................................. 12

21

22

*Doe v. Harris,*
   772 F.3d 563 (9th Cir. 2014) .............................................................................. 14

23

24

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) ............................................................................ 13

25

*Elrod v. Burns,*
   427 U.S. 347 (1976) ........................................................................................... 13

26

27

*Fund Tex. Choice v. Paxton,*
   2023 WL 2558143 (W.D. Tex. Feb. 24, 2023) ..................................................... 5

28

*Gilbert v. Gen. Motors Corp.*,
  2006 WL 1714040 (Tex. App. June 22, 2006)....................................................................13

*Greisen v. Hanken*,
  925 F.3d 1097 (9th Cir. 2019) ..........................................................................................11

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ..........................................................................................14

*Lacey v. Maricopa County*,
  693 F.3d 896 (9th Cir. 2012) ............................................................................................11

*Makaeff v. Trump Univ. LLC*,
  715 F.3d 254 (9th Cir. 2013) ..............................................................................................7

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ............................................................................................14

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ....................................................................................................10, 12

*Near v. Minnesota*,
  283 U.S. 697 (1931) ............................................................................................................7

*Neu v. Terminix Int'l, Inc.*,
  2008 WL 2951390 (N.D. Cal. July 24, 2008) .....................................................................9

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ............................................................................................................7

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) ......................................................................................................11

*Penrose Hill, Ltd. v. Mabray*,
  479 F. Supp. 3d 840 (N.D. Cal. 2020) ................................................................................7

*Pinard v. Clatskanie Sch. Dist. 6J*,
  467 F.3d 755 (9th Cir. 2006) ............................................................................................11

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ..........................................................................................10

*Roe v. Casey*,
  464 F. Supp. 487 (E.D. Pa. 1978) .......................................................................................9

*Sampson v. Cnty. of L.A. by & though L.A. Cnty. Dep't of Child. & Fam. Servs.*,
  974 F.3d 1012 (9th Cir. 2020) ..........................................................................................11

*Smith v. Daily Mail Publishing Co.*,
  443 U.S. 97 (1979) ..............................................................................................................7

iii

*The Florida Star v. B.J.F.*,
    491 U.S. 524 (1989) ................................................................................................ 7

*Ulrich v. City & County of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) ................................................................................ 11

*United States v. Alvarez*,
    567 U.S. 709 (2012) ................................................................................................ 7

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................................ 7

*Va. State Bd. of Pharma. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .............................................................................................. 10

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ................................................................................ 13

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
    32 F.4th 852 (9th Cir. 2022) ................................................................................... 6

**Statutes**

Tex. Bus. & Com. Code Ann.
    § 17.46(a) ............................................................................................................. 12
    § 17.46(b)(2) ........................................................................................................ 12
    § 17.46(b)(3) ........................................................................................................ 12
    § 17.46(b)(8) ........................................................................................................ 12
    § 17.46(b)(24) ...................................................................................................... 12
    § 17.47(a) ............................................................................................................... 6

**Constitutional Provisions**

U.S. Constitution, amend. I ..................................................................................... *passim*

**Other Authorities**

168 Cong. Rec. 4,020 (2022) ........................................................................................ 8

Abigail English et al., *Crisis Pregnancy Centers in the U.S.: Lack of Adherence to
    Medical and Ethical Practice Standards*, 65 J. OF ADOLESCENT HEALTH (2019) ................... 3

"Abortion," Am. Med. Assoc. Code of Med. Ethics, Opinion 4.2.7 ................................ 9

About Abortion, California Abortion Access, https://abortion.ca.gov/getting-an-
    abortion/about-abortion/#how-to-get-an-abortion ........................................................ 9

Amy G. Bryant et al., *Crisis pregnancy center websites: Information, misinformation,
    and disinformation*, CONTRACEPTION (Dec. 2014) ................................................... 2

iv

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

Amy G. Bryant et al., *Why Crisis Pregnancy Centers Are Legal but Unethical*, 20 AMA J. ETHICS (Mar. 2018) ............................................................................................ 3

Andrea Swartzendruber et al., *A Web-Based Geolocated Directory of Crisis Pregnancy Centers (CPCs) in the United States: Description of CPC Map Methods and Design Features and Analysis of Baseline Data*, 6 JMIR PUBLIC HEALTH & SURVEILLANCE (2020) .............................................................................................................. 3

Andrea Swartzendruber et al., *Sexual and Reproductive Health Services and Related Health Information on Pregnancy Resource Center Websites: A Statewide Content Analysis*, WOMEN'S HEALTH ISSUES (Jan-Feb 2018) .............................................. 2

Carly Polcyn et al., *Truth and Transparency in Crisis Pregnancy Centers*, 1 WOMEN'S HEALTH REPS. (2020) ........................................................................................... 3

Elena Kagan, *A Libel Story: Sullivan Then and Now*, 18 LAW & SOC. INQUIRY (1993) ............... 14

Jennifer McKenna et al., *Designed to Deceive: A Study of the Crisis Pregnancy Center Industry in Nine States*, State Advocs. for Women's Rts. & Gender Equal. (2021) ................. 3

Melissa N. Montoya et al., *The Problems with Crisis Pregnancy Centers: Reviewing the Literature and Identifying New Directions for Future Research*, 14 INT'L J. WOMEN'S HEALTH (2022) ..................................................................................................... 3

Restatement of Torts (Second) § 538A ............................................................................ 9

Robin Marty, *How Google Maps Leads Women Seeking Abortions Astray*, Gizmodo (Feb. 12, 2018) ................................................................................................... 2

Sonya Borrero et al., *Crisis Pregnancy Centers: Faith Centers Operating in Bad Faith*, 34 J. GEN. INTERN. MED. 144 (2019) .............................................................. 2

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

1

**<u>NOTICE OF MOTION AND MOTION</u>**

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3     **PLEASE TAKE NOTICE** that no later than November 7, 2023, at 9 a.m.[1] in Courtroom

4     9 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California,

5     Plaintiff Yelp Inc. ("Yelp") will and does move, pursuant to Federal Rules of Civil Procedure

6     65(b), and Local Civil Rules 65-1 and 7-10, for a preliminary injunction, enjoining Defendant Ken

7     Paxton, Attorney General for the State of Texas, from taking any further action to penalize Yelp

8     Inc. for publishing truthful speech about entities that provide pregnancy-related services but not

9     abortion care or referrals ("crisis pregnancy centers"), including stating that crisis pregnancy

10    centers "typically provide limited medical services and may not have licensed medical

11    professionals onsite."  The statement, which is of utmost public concern, is true and absolutely

12    protected by the First Amendment.

13          The Motion is based on this Notice; the attached Memorandum of Points and Authorities;

14    the Declaration of Noorie Malik with exhibits; the Declaration of Adam Sieff with exhibits; all

15    other pleadings, files, and records in this action; and such other argument as this Court may receive.

16

17    DATED:  October 2, 2023               DAVIS WRIGHT TREMAINE LLP

18                                          By:_____/s/ *Ambika Kumar*_____
                                                       Ambika Kumar

19
                                           Attorneys for Plaintiff
20                                         YELP INC.

21

22

23

24

25

26

27

28

---

[1] Yelp intends to seek a stipulation request for expedited review pursuant to Local Civil Rules 6-2, 7-11, and 7-12.

1

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The Texas Attorney General has embarked on a campaign to punish Plaintiff Yelp Inc. ("Yelp") for publishing truthful information about "crisis pregnancy centers" ("CPCs") that undermines his position on abortion.  CPCs offer some pregnancy-related services, but not abortion care or referrals, and many have reportedly used misleading information to divert consumers seeking abortion care.  Last week, the Attorney General threatened to and then (after Yelp filed this lawsuit) did sue Yelp, claiming Yelp "falsely" stated that CPCs "typically provide limited medical services and may not have licensed medical professionals onsite"—even though Yelp undisputedly replaced this (true) statement months ago with one the Attorney General publicly admitted is "accurate."  He now seeks an injunction from a Texas court barring Yelp from speaking truthfully about CPCs anywhere in the world.  An order prohibiting this pattern of hostile retaliation is necessary to avert the ongoing, intended chilling effect of subjecting Yelp—and those who rely on its forum to make informed decisions—to the specter of censorial litigation.

Yelp will prevail on the merits of its claims.  Study after study has shown that CPCs generally provide limited medical services and are often staffed with laypeople.  The Attorney General claims that *some* CPCs offer "unlimited" medical services (which, in his view, excludes abortion and abortion-related services because, also in his view, those are not medical services) or have some licensed medical professionals onsite.  But that does not mean it is *atypical* for CPCs to offer limited medical services, nor that *every* CPC employs licensed medical professionals. Indeed, many CPCs themselves (and their supporters) claim CPCs provide "limited" medical services.  The First Amendment does not permit the government to punish inconvenient truth.

The remaining factors also favor emergency relief.  Yelp is suffering and will continue to suffer irreparable injury from the violation of its First Amendment rights.  The balance of equities and public interest strongly favor the vindication of those rights, as the public has a significant interest in the dissemination of truthful speech—about *any* matter of public concern—without fear of reprisal.  Yelp respectfully asks the Court to preliminarily enjoin the Attorney General from taking any more action designed to deter Yelp from publishing truthful speech related to CPCs.

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

## II.      BACKGROUND

### A.      Yelp's Efforts to Deter Misleading Information about Entities Offering Pregnancy-Related Services.

Yelp owns and operates Yelp.com, a popular local search website, mobile website, and related mobile applications that allow users to share information about their communities and make informed decisions about local businesses and other local entities.  Malik Decl. ¶ 2.  Members of the public may read and write reviews on Yelp, as well as access other forms of information about local businesses, services, and other entities.  *Id.*  Yelp users have contributed approximately 265 cumulative million reviews of local business and other entities.  *Id.* ¶ 3.

Yelp devotes significant resources to deter and eliminate false, fraudulent, immaterial, and misleading reviews.  *Id.* ¶ 4.  It uses sophisticated software to weed out suspicious reviews, such as those that might result from a conflict of interest, improper solicitation, or that may be unreliable or irrelevant.  *Id.*  It provides additional information where helpful to dispel consumer deception or confusion.  *Id.* ¶ 6 (describing Consumer Alert program).

That was the impetus for the events giving rise to this lawsuit.  Reports from 2018 alerted Yelp to efforts by some entities offering pregnancy-related services to divert consumers seeking abortions away from abortion-care providers.  Malik Decl. ¶ 9; *see also* Sieff Decl. Ex. 1 (Robin Marty, *How Google Maps Leads Women Seeking Abortions Astray*, Gizmodo (Feb. 12, 2018)).  Studies from top medical schools found that these entities, sometimes called crisis pregnancy centers ("CPCs"), achieve this diversion by providing misleading information.  *See* Sieff Decl. Ex. 2 at 602-03 (Amy G. Bryant et al., *Crisis pregnancy center websites: Information, misinformation, and disinformation*, CONTRACEPTION (Dec. 2014)); *id.* Ex. 3 at 15-18 (Andrea Swartzendruber et al., *Sexual and Reproductive Health Services and Related Health Information on Pregnancy Resource Center Websites: A Statewide Content Analysis*, WOMEN'S HEALTH ISSUES (Jan-Feb 2018)).  According to one study, CPCs "employ sophisticated strategies to draw in women who are seeking abortion services," who "find that they neither provide abortion nor refer to abortion providers."  *Id.* Ex. 4 at 144-45 (Sonya Borrero et al., *Crisis Pregnancy Centers: Faith Centers Operating in Bad Faith*, 34 J. GEN. INTERN. MED. 144, 144-45 (2019)).

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

Consistent with these conclusions, studies also show CPCs generally do not provide unlimited women's reproductive healthcare, are not licensed medical clinics, and have staff who are laypeople, not licensed professionals. *See id.* Ex. 5 at 271 (Amy G. Bryant et al., *Why Crisis Pregnancy Centers Are Legal but Unethical*, 20 AMA J. ETHICS 269, 271 (Mar. 2018)); *id.* Ex. 6 at 823 (Abigail English et al., *Crisis Pregnancy Centers in the U.S.: Lack of Adherence to Medical and Ethical Practice Standards*, 65 J. OF ADOLESCENT HEALTH 821, 823 (2019)) ("CPCs are typically staffed by volunteers without clinical training or licensure"); *id.* Ex. 7 at 760 (Melissa N. Montoya et al., *The Problems with Crisis Pregnancy Centers: Reviewing the Literature and Identifying New Directions for Future Research*, 14 INT'L J. WOMEN'S HEALTH 757, 760 (2022)) (citing study showing "only 26% and 16% of CPCs have a registered nurse or physician on staff, respectively"); *id.* Ex. 8 at 5, 7 (Jennifer McKenna et al., *Designed to Deceive: A Study of the Crisis Pregnancy Center Industry in Nine States*, State Advocs. for Women's Rts. & Gender Equal. 5, 7 (2021)) (same study showed CPCs "provided virtually no medical care" despite "misleadingly present[ing] themselves as medical facilities"); *id.* Ex. 9 at 225 (Carly Polcyn et al., *Truth and Transparency in Crisis Pregnancy Centers*, 1 WOMEN'S HEALTH REPS. 224, 225 (2020)) (CPCs "offer[] only select services" and are "largely staffed by volunteers" who "may not be licensed" to offer them); *id.* Ex. 19 at 2, 5 (Andrea Swartzendruber et al., *A Web-Based Geolocated Directory of Crisis Pregnancy Centers (CPCs) in the United States: Description of CPC Map Methods and Design Features and Analysis of Baseline Data*, 6 JMIR PUBLIC HEALTH & SURVEILLANCE 1, 2, 5 (2020)) (only 66.17% of CPCs offer any medical services, and even those offer only "limited medical services, such as limited obstetric ultrasounds to confirm pregnancy and testing for some sexually transmitted infections").

In fact, pro-life medical organizations have themselves told the United States Supreme Court that CPCs "offer limited medical services." Br. of Am. Assoc. of Pro Life Obstetricians and Gynecologists, Am. College of Pediatrics, & Christian Med. Assoc. as Amici Curiae at 5-6, 10, 14, 20, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 2018 WL 447347, at *5-6, 10, 14, 20 (U.S. filed Jan. 16, 2018) ("*NIFLA v. Becerra* Amicus Br.") ("Pregnancy centers offer limited medical services"). The pro-life organization Heartbeat International similarly describes CPCs as

providing information, material support, and in some cases, "limited medical care."  Sieff Decl. Ex. 14 (*What is a Pregnancy Center?*, Heartbeat International).  And CPC websites often post disclaimers stating their service is a "limited medical clinic" or "limited medical facility."  *See, e.g.*, Sieff Decl. Ex. 15 at 9; *id.* Ex. 16 at 2; *id.* Ex. 17 at 3.

Once alerted to the issue, Yelp manually evaluated pages providing pregnancy-related services and, where appropriate, categorized those that do not offer abortion services or referrals as "Crisis Pregnancy Centers." Malik Decl. ¶ 10.  Following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), Yelp added a "Consumer Notice" on CPC pages informing consumers that CPCs "typically provide limited medical services and may not have licensed medical professionals onsite." *Id.* ¶¶ 13-14.  This was done to address the concerns, described in many reports and reviews on Yelp, that many consumers do not understand CPCs' role or the nature of their services. *Id.* ¶¶ 13-15.  Yelp chose this language after considering several publicly available studies concluding the same thing. *Id.* ¶ 14 & Exs. C, D, E.

Then and now, users searching for pregnancy resources or services, including for CPCs, can access pages for CPCs, and can provide reviews, ratings, and other contributions to CPC pages, just as they can for other entities. *Id.* ¶ 11.

**B.** **Attorney General Paxton's Efforts to Silence Yelp.**

In response, a coalition of 24 state attorneys general, including Attorney General Paxton, wrote Yelp on February 7, 2023, claiming the Consumer Notice was "misleading" and designed "to discourage women and families from accessing [CPCs'] services." *See* Dkt. 1 ("Compl."); Malik Decl. Ex. F at 2.  The Attorney General—who opposes abortions even where they are legal, and whose website lists dozens of actions to suppress information about and access to abortion, *see* Sieff Decl. Ex. 12—took issue with Yelp's purported attempt to "discredit" and "discriminate against" CPCs, characterizing its actions as part of a "dangerous axis of corporate and government power." Malik Decl. Ex. F at 1-2.  The letter criticized Yelp's decision not to affix any comparable notice to "abortion facilities operated by Planned Parenthood and related organizations," *id.* at 2, even though Yelp has seen no widespread academic studies, media reports, or other credible evidence indicating consumers are misled or confused about those facilities' services. *See* Malik

4
YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

Decl. ¶ 15.  The letter was part of the Attorney General's dedicated, ongoing, and successful effort to project his personal view on abortion into other states, with the intent to limit access to legal abortions and information about them.  *See, e.g.*, *Fund Tex. Choice v. Paxton*, 2023 WL 2558143, at \*5-7 (W.D. Tex. Feb. 24, 2023) (reviewing evidence that the Attorney General's statements chilled protected speech related to obtaining abortions in states where procedures remained legal).

Yelp responded the following day, citing research demonstrating that the Notice "is accurate and not misleading."  Malik Decl. ¶ 16 & Ex. G at 2-3.  Solely to address these unfounded concerns and avoid the possibility of unnecessary litigation, Yelp that day revised the already-truthful Consumer Notice to state that "Crisis Pregnancy Centers do not offer abortions or referrals to abortion providers."  *Id.*  On February 14, 2023, the Attorney General's office issued an updated press release stating that the revised notice provided "an accurate description"—even though the description implicitly acknowledges that CPCs offer only limited medical services, as Yelp originally stated.  *Id.* (copy of revised notice); Sieff Decl. Ex. 10 (Tex. Att'y Gen. Ken Paxton, Press Release, Paxton Condemns Yelp for Discriminating Against Crisis Pregnancy Centers (Feb. 14, 2023)).  The other 23 state attorneys general who signed the February 7, 2023, letter took no action.  In fact, the letter's lead author, the Kentucky Attorney General, publicly praised Yelp's response.  Sieff Decl. Ex. 18.

It thus came as a surprise when, in a September 22, 2023 letter—received by Yelp on September 26, 2023—the Attorney General provided "notice of intent to file suit," claiming Yelp violated the Texas Deceptive Trade Practices Act ("DTPA") by publishing the original (superseded and withdrawn) Consumer Notice.  *See* Malik Decl. Ex. H at 1 (cleaned up).

On September 27, 2023, Yelp filed this action, seeking a declaration and injunction stopping the Attorney General from further penalizing Yelp for publishing truthful speech about CPCs.  Dkt. 1.  The next day, the Attorney General filed a petition against Yelp in Texas.  Sieff Decl. Ex. 11 ("Petition").  The Petition asks the Texas court to enjoin Yelp from "[m]isrepresenting the status or amount of licensed medical professionals onsite in pregnancy resource centers" or "the services offered by pregnancy resource centers"; and from "[p]osting any further false and/or misleading disclaimers or representations regarding pregnancy resource centers," without any

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

geographic limit.  Sieff Decl. Ex. 11 ¶ 32.  The Petition claims "Yelp has been given notice of the alleged unlawful conduct described below at least seven days before filing suit, as may be required by subsection 17.47(a) of the DTPA," *id.* ¶ 11, even though the letter is dated September 22, 2023, and did not arrive at Yelp's offices until September 26, 2023.  Malik Decl. ¶ 18 & Ex. H.  The Petition seeks civil penalties of $10,000 per alleged violation, and $250,000 per alleged violation for consumers age 65 or older.  *Id.* ¶ 33.  The Attorney General states he expects to recover more than $1,000,000.  *Id.* ¶ 3.

Yelp seeks preliminary relief enjoining the Attorney General from taking further action to penalize Yelp for publishing truthful statements about CPCs, including that CPCs "typically provide limited medical services and may not have licensed medical professionals onsite."

## III.   LEGAL STANDARD

A party moving for a preliminary injunction "must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022).  These factors are balanced on a sliding scale.  When the balance of hardships tips "sharply" in the movant's favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, the movant need only show "'serious questions' on the merits." *Id.* (citation omitted).  An injunction is warranted here.

## IV.   YELP WILL PREVAIL ON THE MERITS

The Attorney General's pattern of bad faith retaliation seeks to punish Yelp for publishing truthful information protected by the First Amendment, chills Yelp's exercise of those protected editorial rights, and fails to state a claim even under the Texas DTPA.

### A.   The First Amendment Bars Punishing Truthful Speech of Public Concern.

"[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). Beyond the "well-defined and narrowly limited classes of speech" "outside the reach of [the First Amendment] altogether"—"obscenity," "defamation," "fraud," "incitement," and "speech integral

YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

to criminal conduct"—*truthful* speech about matters of public concern enjoys near-absolute protection. *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (citations omitted); *cf. United States v. Alvarez*, 567 U.S. 709, 722 (2012) (First Amendment even protects falsity). The Supreme Court has never upheld state action to penalize publication of such information, whether they be state secrets, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971), names of juvenile delinquents, *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 105-06 (1979), identities of rape victims, *The Florida Star v. B.J.F.*, 491 U.S. 524, 532-41 (1989), or even information obtained through "a stranger's illegal conduct," *Bartnicki*, 532 U.S. at 535. Even where the Supreme Court has "hypothesiz[ed]" what "state interest[s] of the highest order" might justify punishing truthful publication on issues of public concern, it has confined those interests to the extreme margins of ordinary discourse, such as preventing "publication of the sailing dates of transports or the number and location of troops" at sea in wartime. *Fla. Star*, 491 U.S. at 532-33 (quoting *Near v. Minnesota*, 283 U.S. 697, 716 (1931)).

Yelp's decision to publish information accurately describing the services CPCs "typically" offer and type of personnel they "may not have" onsite falls squarely within the First Amendment's protection for truthful statements involving matters of public concern. *See* Malik Decl. ¶ 14. Yelp's speech "relates to a matter of public concern" because it "provides information to aid consumers in choosing which businesses to patronize." *Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840, 855 (N.D. Cal. 2020) (citing *Makaeff v. Trump Univ. LLC*, 715 F.3d 254, 263 (9th Cir. 2013)). And the challenged statement is true. Yelp only published its advisory on pages for entities that *it* identified as a CPC, a category that includes entities that provide limited medical services (e.g., no abortions or abortion-related services) and which may not have licensed medical professionals. *See* Malik Decl. ¶¶ 10-12, 14. Entities that do not offer abortions or referrals to abortion providers (i.e., CPCs, by the Attorney General's own admission) fit this description.

Publicly available reports and studies corroborate Yelp's statement. A report by the American Medical Association, for example, found "most" CPCs "do not provide comprehensive women's reproductive healthcare," and many "are not licensed medical clinics" and may employ staff who "are not licensed medical professionals." Sieff Decl. Ex. 5 at 271. Another found that

7

"CPCs are typically staffed by volunteers without clinical training or licensure," and that "licensed medical professionals" only "serve as paid staff or volunteer at some centers."  Sieff Decl. Ex. 6 at 823.  A study of CPCs in nine states (including California) reviewed by the International Journal of Women's Health found that "only 26% and 16% of CPCs have a registered nurse or physician on staff, respectively, which underscores that individuals attending CPCs are not receiving medical care."  Sieff Decl. Ex. 7 at 760.  That underlying study concluded that CPCs "provided virtually no medical care" despite "misleadingly present[ing] themselves as medical facilities."  Sieff Decl. Ex. 8 at 5, 7.  Research published by medical professors in Women's Health Reports similarly found that CPCs "offer[] only select services" and are "largely staffed by volunteers" who "may not be licensed" to offer them.  Sieff Decl. Ex. 9 at 225.

Even pro-life organizations, including the American Association of Pro Life Obstetricians and Gynecologists, the American College of Pediatrics, and the Christian Medical Association, have emphasized the "limited medical services" CPCs provide.  *See NIFLA v. Becerra* Amicus Br. at 5-6, 10, 14, 20.  Another organization, Heartbeat International, notes that only some CPCs offer any medical support and even those offer only "limited medical care."  Sieff Decl. Ex. 14 (*What is a Pregnancy Center?*, Heartbeat International).  And many CPCs themselves advise that they provide "limited medical" services.  *See, e.g.*, *id.* Ex. 15 at 9; *id.* Ex. 16 at 2; *id.* Ex. 17 at 3.

The weight of this evidence compelled government officials to issue warnings.  The California Attorney General, for instance, published a "Consumer Alert" on June 1, 2022 stating CPCs "often" "do not provide comprehensive reproductive healthcare," and "some" "are not licensed medical clinics … staffed by non-medical personnel." *See* Cal. Dep't of Just., Consumer Alert, *Know The Difference: Crisis Pregnancy Centers v. Reproductive Healthcare Facilities* (June 2022) (Sieff Decl. Ex 13).  U.S. Senator Elizabeth Warren likewise warned that "CPCs rarely employ licensed physicians or offer a full range of reproductive health services."  168 Cong. Rec. 4,020 (2022).

The Attorney General has provided no evidence that Yelp's statement was false.  Nor could he.  With respect to Yelp's statement that CPCs "typically" offer "limited services," none of the CPCs the Attorney General identifies offer abortions or referrals to abortion providers, something

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

he admits.  Sieff Decl. Ex. 10 (press release).  Whether these CPCs market their medical services as "comprehensive" is irrelevant.  Yelp did not say CPCs *never* offer medical services that CPCs consider "comprehensive."  And Yelp's statement that CPCs "typically provide limited medical services" is true because CPCs undisputedly do not provide abortion care, which *is* a medical service.[2]  In any event, Yelp's "generalization" about services CPCs "typically" provide "cannot be falsified by pointing to a limited set of counterexamples."  *Brennan v. Stewart*, 834 F.2d 1248, 1259 (5th Cir. 1988).  It is precisely because some CPCs make misleading claims about providing "comprehensive" services that Yelp decided to provide the Consumer Notice to begin with.

The Attorney General also cannot prove the falsity of Yelp's statement that CPCs "*may not* have licensed medical professionals onsite"  Sieff Decl. Ex. 11 ¶ 19 (emphasis added).  Although the Attorney General identifies isolated CPCs that staff licensed medical doctors on-premises, *id.* ¶¶ 23-24, Yelp did not say CPCs *never* do so.  It stated only that entities it categorized as CPCs "*may not* have licensed medical professionals onsite." *Id.* ¶ 19 (emphasis added).  This, too, is an unfalsifiable "generalization." *Brennan*, 834 F.2d at 1259.  Further, Yelp's beliefs about the personnel CPCs "may" offer are merely "predictions of future facts." *Neu v. Terminix Int'l, Inc.*, 2008 WL 2951390, at *3 (N.D. Cal. July 24, 2008) (citing Restatement of Torts (Second) § 538A); *see, e.g.*, *Dena' Nena' Henash, Inc. v. Oracle Corp.*, 2007 WL 1455905, at *3 (N.D. Cal. May 16, 2007) (generalizations offered "without certainty" "cannot be proved false").  They are also supported by evidence. *See* Sieff Decl. Exs. 5-9, 19; Malik Decl. ¶ 14 & Exs. C, D, E.

Unable to prove Yelp's statement false, the Attorney General claims the Consumer Notice tended to "elevate abortion providers and disparage pregnancy centers that do not provide abortions," purportedly causing consumers to visit abortion providers instead of CPCs.  Sieff Decl. Ex. 11 ¶¶ 19, 20-22, 28.  But truthful speech that allegedly promotes an outcome the government disfavors is not thereby "misleading."  Although the Attorney General may *prefer* more pregnant women visit CPCs than abortion providers, he "does not have the broad discretion to suppress

---

[2] *See Roe v. Casey*, 464 F. Supp. 487, 500 (E.D. Pa. 1978) (taking judicial notice of fact that "standard abortion procedures necessarily involve" medical services); *see also, e.g.*, "Abortion," Am. Med. Assoc. Code of Med. Ethics, Opinion 4.2.7 ("Abortion is a safe and common medical procedure[.]") (Sieff Decl. Ex. 20); About Abortion, California Abortion Access, https://abortion.ca.gov/getting-an-abortion/about-abortion/#how-to-get-an-abortion (Sieff Decl. Ex. 21) ("An abortion is a medical treatment that ends pregnancy." (emphasis omitted)).

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

truthful, nonmisleading information for paternalistic purposes." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 510 (1996). "The First Amendment directs us to be especially skeptical" when state action "seek[s] to keep people in the dark for what the government perceives to be their own good," including where, as here, the government threatens penalties that would "deprive consumers of accurate information." *Id.* at 503. That is the lesson of *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 769-70 (1976), where the Supreme Court invalidated a law penalizing publication of truthful business information that allegedly steered the public to make disfavored choices. Our constitutional order rejects that approach and contemplates that "people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication[,] rather than to close them." *Id.* at 770.

The Attorney General notes that Yelp has not placed similar notices on listings for abortion care providers. *See e.g.*, Sieff Decl. Ex. 11 ¶¶ 20, 24, 28. This is not only irrelevant, it underscores that the Attorney General seeks to punish Yelp for its editorial choices. Yelp merely seeks to provide its users trustworthy, reliable, and useful information. *See* Malik Decl. ¶¶ 4, 6, 8, 14. That it does not provide a similar notice for listings for Planned Parenthood locations, for instance, is not a material "omission," but a reflection of the fact that no notice is necessary to eliminate consumer confusion. *Id.* ¶ 15; *cf., e.g.*, *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (failure to speak not materially misleading where allegedly omitted fact was not "necessary" to convey the truth). The Attorney General may disfavor the bias he perceives this to create, but he can no more use baseless litigation to intimidate Yelp's truthful publication of accurate information than compel Yelp to publish counter warnings advancing his preferences. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 247, 256-58 (1974) (First Amendment prohibits government from requiring newspapers to give speakers a "right to reply"). The Attorney General cannot wield consumer protection laws to promote his preferred false equivalence. *Id.*

**B.      The Attorney General's Retaliatory Suit Violates the First Amendment.**

Yelp is also likely to prevail on its First Amendment retaliation claim, which requires

10

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

showing "(1) [the plaintiff] was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006).  Upon such a showing, "the defendant can prevail only by showing that the [conduct at issue] would have been initiated without respect to retaliation." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019).  This test is satisfied here.

*First*, Yelp's speech is protected.  *See supra* § IV.A.

*Second*, the Attorney General's actions "would chill or silence a person of ordinary firmness from future First Amendment activities." *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012).  Yelp "need not show [its] 'speech was actually inhibited or suppressed.'" *Id.*  The First Amendment protects against "retaliation in the form of *threatened* legal sanctions and other similar means of coercion, persuasion, and intimidation." *Sampson v. Cnty. of L.A. by & though L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1020 (9th Cir. 2020) (emphasis added). In *Ulrich v. City & County of San Francisco*, 308 F.3d 968 (9th Cir. 2002), for example, the court held that an investigation of a doctor that implicitly threatened (but had not yet) revoked his clinical privileges was actionable, *id.* at 977.  *See also, e.g., Greisen v. Hanken,* 925 F.3d 1097, 1114 (9th Cir. 2019) ("[R]etaliatory speech may serve as the basis for a First Amendment retaliation claim when it intimates that some form of punishment or adverse regulatory action would follow." (internal quotation marks and alterations omitted)).  Here, the Attorney General's threat to punish truthful information designed to *deter* consumer deception would silence a person of ordinary firmness from making even truthful statements with which the Attorney General may disagree.

*Third*, the Attorney General's threat of litigation, culminating in a lawsuit filed in Texas, transparently reacts to, and was motivated by, Yelp's editorial choices.  To satisfy this factor, Yelp need only show that its protected speech was "a substantial or motivating factor in [AG Paxton's] conduct." *Pinard*, 467 F.3d at 770.  Although the Attorney General might argue that his actions are designed to help consumers, they are plainly a response to Yelp's publication of truthful statements about entities that do not provide abortion services.  "Bias" in the media is not a

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

1    legitimate subject of law enforcement scrutiny.  The First Amendment protects Yelp's right to

2    decide what truthful information to disseminate, *Tornillo*, 418 U.S. at 256-58, even if others

3    perceive those choices as biased, as they inevitably will.  *See also, e.g., Bullfrog Films, Inc. v.*

4    *Wick*, 847 F.2d 502, 510 (9th Cir. 1988) ("The danger inherent in government editorial oversight,

5    even in the interest of 'balance,' is well established.").

6              **C.    Yelp Has Not Violated the Texas Deceptive Trade Practices Act.**

7              For still more reasons, the Attorney General has not plausibly alleged, much less shown,

8    Yelp has violated the DTPA.  The DTPA prohibits "[f]alse, misleading, or deceptive acts or

9    practices in the conduct of any trade or commerce."  Tex. Bus. & Com. Code Ann. § 17.46(a).

10   The "term 'false, misleading, or deceptive acts or practices' includes, but is not limited to" certain

11   enumerated acts, four of which the Petition invokes, Sieff Decl. Ex. 11 ¶ 30: (i) "causing confusion

12   or misunderstanding as to the source, sponsorship, approval, or certification of goods or services,"

13   § 17.46(b)(2); (ii) "causing confusion or misunderstanding as to affiliation, connection, or

14   association with, or certification by, another," § 17.46(b)(3); (iii) "disparaging the goods, services,

15   or business of another by false or misleading representation of facts," § 17.46(b)(8); and (iv)

16   "failing to disclose information concerning goods or services which was known at the time of the

17   transaction if such failure to disclose such information was intended to induce the consumer into

18   a transaction into which the consumer would not have entered had the information been disclosed,"

19   § 17.46(b)(24).

20             None of these predicates applies here.  "Absent evidence that the defendant's statement

21   was false, a DTPA action for misrepresentation cannot survive[.]"  *Doe v. Boys Clubs of Greater*

22   *Dallas, Inc.*, 907 S.W.2d 472, 480 (Tex. 1995).  There is nothing "false, misleading, or deceptive"

23   about publishing truthful speech.  *See supra* § IV.A.  Nor can the Attorney General show a

24   violation of the subsections he cites.  Subsections 17.46(b)(2) and (3) concern conduct that

25   confuses consumers about whether goods, services, or businesses are those of the defendant or its

26   competitors; there is no allegation of such confusion here.  Subsection (b)(8) does not apply

27   because Yelp's statements were truthful and not misleading.  *See supra* § IV.A.  Subsection (b)(24)

28   does not apply because it is limited, by its terms, to failures to disclose information in a way that

induces a transaction; there is no "transaction" here. *See Gilbert v. Gen. Motors Corp.*, 2006 WL 1714040, at *6 (Tex. App. June 22, 2006) (entering judgment where was "no evidence of any transaction") (citing *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (same holding)).

## V.      YELP WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Thus, even a "colorable First Amendment claim" warrants a preliminary injunction. *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).  Yelp's claim is not only colorable but strong.  By declaring the Consumer Notice "false" and "misleading," the Attorney General seeks to punish Yelp for, and deter Yelp from, publishing truthful information on a contested matter of public concern, in transparent retaliation for exercising its rights to free speech.  Yelp plans to continue communicating truthful information about CPCs.  Malik Decl. ¶¶ 19-23.  Unless the Court enjoins the Attorney General from taking any action that deters, denies, or discourages such communications, Yelp will need to seriously consider self-censoring.  *Id.*  That self-censorship could extend to any potentially controversial topic to which the Attorney General turns his attention—such as businesses' policies on requirements that patrons wear a mask or be vaccinated against COVID-19, their policies with respect to gender-neutral bathrooms, or reviews of drag shows, *id.* ¶¶ 20-22; *see also* Sieff Decl. Exs. 23 & 24 (describing the Attorney General's campaigns to punish these activities)—and constitutes an irreparable injury. *See Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004) (preliminary injunction appropriate to prevent irreparable loss of First Amendment rights because "speakers may self-censor rather than risk the perils of trial").

## VI.     EQUITY AND THE PUBLIC INTEREST FAVOR IMMEDIATE RELIEF

These factors—merged in a case against the government, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)— support injunctive relief.  "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Assoc. Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).  "[S]erious First Amendment questions compel[] a finding that … the balance of hardships tips sharply in the plaintiffs' favor," *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (internal

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

quotation marks omitted, cleaned up), and "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted, cleaned up); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (equity favors party "whose First Amendment right" is "chilled"); *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) ("significant public interest" upholding free speech).

Equity and the public interest strongly favor Yelp.  The Attorney General's threatened actions will color Yelp's decisions to provide truthful information to its customers merely because the Attorney General may not agree with those decisions.  In fact, that is his point.  Censorial state actors like the Attorney General have long understood that threatening speech with specious litigation is enough to drive it out of discourse.  *See, e.g.*, Elena Kagan, *A Libel Story: Sullivan Then and Now*, 18 LAW & SOC. INQUIRY 197, 199-201 (1993) (describing "concerted campaign" to "curtail media coverage of the civil rights struggle" through punishing but meritless litigation); *see also* Sieff Decl. Exs. 23 & 24 (reports on the Attorney General's other campaigns to punish conduct about which Yelp—*see* Malik Decl. ¶¶ 20-23—publishes consumer notices).  An injunction is necessary to prevent that irreparable injury not just to Yelp, but those who rely on Yelp's forum to make informed choices about reproductive care.

## VII.   CONCLUSION

For these reasons, Yelp respectfully requests an order enjoining the Attorney General from taking any further action to penalize its publication of truthful speech about CPCs, including the statement that CPCs "typically provide limited medical services and may not have licensed medical professionals onsite."

DATED:  October 2, 2023

DAVIS WRIGHT TREMAINE LLP

By: */s/   Ambika Kumar*
　　　　Ambika Kumar

Attorneys for Plaintiff
YELP INC.

14
YELP'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500