THOMAS R. BURKE (CA Bar No. 141930)
  thomasburke@dwt.com
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, California 94111
Telephone: (415) 276-6500

AMBIKA KUMAR (*pro hac vice*)
  ambikakumar@dwt.com
SARA A. FAIRCHILD (*pro hac vice*)
  sarafairchild@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
  adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017
Telephone: (213) 633-6800

Attorneys for Plaintiff
YELP INC.

## IN THE UNITED STATES DISTRICT COURT

## THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| YELP INC., | Case No.  3:23-cv-04977-TLT |
| Plaintiff, | **YELP INC.'S STATEMENT OF RECENT DECISION** |
| v. | Date:    November 7, 2023 |
| KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, in his official capacity, | Time:    9:00 AM<br>Dept.:    Courtroom 9 |
| Defendant. | Action Filed: September 27, 2023 |

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Local Civil Rule 7-3(d)(2), Plaintiff Yelp Inc. provides the attached supplemental authority, *Netflix, Inc. v. Babin,* No. 22-40786 (5th Cir.), which was decided December 18, 2023.


DATED:  December 19, 2023                    DAVIS WRIGHT TREMAINE LLP

By: */s/  Ambika Kumar*
         Ambika Kumar

Attorneys for Plaintiff YELP INC.

YELP'S STATEMENT OF RECENT DECISION
Case No. 3:23-cv-04977-TLT

DAVIS WRIGHT TREMAINE LLP
50 CALIFORNIA STREET, 23RD FLOOR
SAN FRANCISCO, CALIFORNIA 94111
Tel: (415) 276-6500

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 18, 2023

Lyle W. Cayce
Clerk

No. 22-40786

Netflix, Incorporated,

*Plaintiff—Appellee,*

*versus*

Lucas Babin,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 9:22-CV-31

Before Wiener, Willett, and Douglas, *Circuit Judges.*

Don R. Willett, *Circuit Judge*:

    *Younger* abstention is one of a handful of federalism-flavored carveouts to a federal court's "virtually unflagging obligation"[1] to exercise congressionally conferred jurisdiction. Out of respect for the legitimate interest of the state, and to avoid needless friction, federal courts may not interfere with an ongoing state criminal proceeding, so long as the defendant

---

[1] *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 821 (1976).

being prosecuted has an adequate opportunity to raise constitutional challenges in the underlying state forum.

A state has no legitimate interest, however, in a prosecution brought in bad faith or to harass. Nor, for that matter, does a defendant have an adequate opportunity to assert constitutional violations in the state proceeding when the prosecution *itself* is the constitutional violation. Thus, in exceptional cases in which a state prosecutor is credibly accused of bad faith and has no reasonable hope of obtaining a valid conviction against the defendant, comity-infused deference gives way, and a federal court may exercise its equitable power to enjoin the prosecution.

In this case, a Texas state prosecutor, Lucas Babin, criminally charged Netflix for advertising and promoting child pornography based on its streaming of *Cuties*, a controversial film starring preteen girls who participate in a dance competition. Soon after Netflix asserted its First Amendment right to stream and promote *Cuties*, Babin multiplied the first indictment into four, selectively presented evidence to the grand jury, and inexplicably charged Netflix for a scene that involved a verifiably adult actress. Based on these and other allegations of bad faith, Netflix sought and successfully obtained a preliminary injunction against Babin and his prosecution. Babin now appeals, arguing that the district court clearly erred in finding bad faith and abused its discretion by declining to abstain under *Younger*.

At this preliminary stage, and on the fact-intensive record before us, we cannot conclude that the district court erred. With the benefit of a seven-hour evidentiary hearing, including Babin's own testimony, the district court was best positioned to make the largely credibility-based determination of bad faith. The findings underlying that determination, along with the inferences drawn from them, are not clearly erroneous, and they likely warranted injunctive relief under what we have historically understood to be—and

continue to recognize as—a narrow exception to *Younger* abstention. We accordingly AFFIRM.

## I

## A

This federal lawsuit, and the parallel state criminal prosecution, follows Netflix's decision to stream a French film called *Cuties*, a story about an eleven-year-old Senegalese girl named Amy who wants to perform at a dance competition with her friends. The film presents "an unflinching view" of Amy and her dance team (the "Cuties," or "Mignonnes" in its native French) preparing for the competition, and the underlying storyline is about Amy attempting to navigate between the conservative culture of her devoutly Muslim family and the provocative culture of modern dance. As the district court explained, "*Cuties* depicts and explores various relationships . . . while vividly revealing to viewers the dangers and consequences of leaving children unrestrained from—and at the mercy of—the highly sexualized and media-driven culture in which they are now immersed." In conveying that message, the film shows Amy and the Cuties attempting to mimic modern dance culture by performing public dance routines "while wearing cut-off tops and tight, short shorts."

There are no sex scenes in *Cuties*, to be sure, but two scenes in the film, among others, have received heightened scrutiny in this litigation. The first involves the main character, Amy, who is shown partaking in a "religious cleansing" in one of the film's most dramatic moments—a "kind of baptism," as the district court understood it. "*In context*," Netflix emphasizes, "the scene symbolizes the inner conflict Amy is battling between her spiritual beliefs and societal influences," but stripped of the symbolism and viewed in isolation, it simply shows "a young girl in underwear and a tank top, by herself, convulsing on the floor," while her

"mother and auntie administer water on her body." The second relevant scene is less significant but more explicit. "In [that] scene," the district court recounted, "the Cuties are watching a video on one of their phones when a dancer in the video flashes her breast for a fraction of a second." The district court determined that the briefly nude dancer in that scene, who the parties call "Jane Doe," was over the age of eighteen at the time *Cuties* was filmed.

*Cuties*, which was filmed in France in 2019, premiered a year later at the Sundance Film Festival in Utah, and Netflix began streaming *Cuties* to its subscribers nationwide in September 2020, during the throes of the COVID-19 pandemic. Perhaps predictably, the reviews of *Cuties* were mixed. As Netflix frames it, "*Cuties'* public reception was not entirely positive." Indeed, some were downright repulsed by what they saw. Criticism flared when at least three members of Congress expressed their senatorial scorn for the film, one of whom took the additional step of referring the film via 𝕏 (formerly Twitter) to the Department of Justice.

Among the number displeased and disgusted by *Cuties* is the defendant in this case, Lucas Babin, a former actor himself but now the district attorney of Tyler County, Texas. Believing that some scenes in *Cuties* amounted to "obscenity," Babin sought, and a grand jury returned, an indictment charging Netflix with the "promotion of lewd visual material depicting [a] child" under § 43.262 of the Texas Penal Code. Babin obtained the indictments just two weeks after *Cuties* debuted on Netflix, becoming the first—and so far, the only—prosecutor in America to criminally charge Netflix for the film. Babin embraced the novelty, though, and candidly expressed his motivation for seeking the charge in a press release he later issued on his webpage:

> After hearing about the movie Cuties and watching it, I knew there was probable cause to believe it was criminal under Section 43.262 of the Texas Penal Code. The legislators of this

state believe promoting certain lewd material of children has destructive consequences. If such material is distributed on a grand scale, isn't the need to prosecute more, not less? A grand jury in Tyler [C]ounty found probable cause for this felony, and my job is to uphold the laws of this State and see that justice is done.

According to his press release (and later, his testimony), Babin watched the entire film before seeking criminal charges. But the same cannot be said of the grand jury. With the help of "screen-recording software," Babin admitted that he showed the grand jury only curated clips and images of *Cuties*, singling out some of the most provocative scenes, including the one of Amy undergoing her moment of partially clad "spiritual cleansing." Based on this selective presentation of the evidence, the grand jury found probable cause to charge Netflix under § 43.262 of the Texas Penal Code.

Netflix is quick to point out that, upon receipt of the indictment, it "did not run to federal court for protection," but instead prepared to defend itself in state court. To that end, Netflix arranged a meeting with Babin and his first assistant, Pat "Hawk" Hardy, to discuss the indictment. During that October 2020 meeting, Netflix asked Babin and Hardy what "specifically prompted the indictment," adding that if the problematic portion of the film was the exposed breast, Netflix would be willing to share proof that the actress was over eighteen years old. Babin and Hardy declined, expressing no need to look at the proof and instead emphasizing that the "gravamen" of the indictment was the "suggestive way" in which the younger girls danced. On that point, the parties amicably disagreed about the legality of the scenes involving those girls and went their separate ways.

Unsurprisingly, Netflix pleaded not guilty to the charge a couple of weeks later and waived its right to an arraignment. But perhaps more surprisingly, Netflix's plea did not set in motion the usual prosecutorial

process—at least not immediately. For the next year, the case sat idle. No motions, no hearings, no discovery. Babin says this was partly due to COVID-related delays, and both parties suggest that the other is to blame for the inaction. Whatever the reason, the lull ended in October 2021, when the First Court of Appeals of Texas held in an unrelated case that § 43.262 of the Texas Penal Code (the statute under which Babin charged Netflix) was facially unconstitutional under the First Amendment.[2] And, coincidentally, in its discussion of the statute's overly broad scope, the First Court of Appeals noted that "at least one prosecutor [*i.e.*, Babin] has indicted Netflix for showing" *Cuties* and that, as written, "the statute could apply not only to Netflix, but to those persons who viewed the offending visual material."[3]

Dutifully, Netflix provided Babin a copy of the *Lowry* opinion the day it was decided, "reminding [him] that his obligations to enforce the State's laws 'extend[ed] only to constitutional laws,'" and urging him to drop the charge. Babin refused. So, with the charge still pending, Netflix filed a pretrial writ of habeas corpus, arguing that the indictment should be dismissed given the facial unconstitutionality of § 43.262. After some back-and-forth about scheduling and statutory deadlines, Netflix and Babin finally agreed to schedule a hearing on Netflix's habeas petition a few months out, in March 2022.

According to Netflix, Babin used those few months before the hearing on the habeas petition to empanel another grand jury and seek four new indictments under § 43.25(d) of the Texas Penal Code, a narrower but more severe criminal statute that prohibits the promotion of "sexual conduct by a child younger than 18 years of age." "Consistent with [that] plan," Netflix

---

[2] *Ex parte Lowry*, 639 S.W.3d 151, 169 (Tex. App.—Houston [1st Dist.] 2021, pet. granted).

[3] *Id.*

says, "Babin convened [a] second grand jury on February 25, 2022," and "[o]nce again, rather than provide the grand jury with the actual film, Babin restricted the grand jury's view to only those scenes and stills that he [had] personally curated and stripped of their proper context." Babin, for his part, denies that he ever had such a "plan" or that he even has the power to "convene" a grand jury. Nevertheless, just two days before the scheduled hearing on Netflix's habeas petition, Babin emailed Netflix to say that he was dropping the charge under § 43.262 and that a hearing on the habeas petition was no longer needed. But, he added, "[s]eparate indictments will be served on [your] registered agent within the next few days. Wanted to give you a heads-up."

As promised, Babin dismissed the first indictment (albeit without prejudice) the next day and issued four new indictments under § 43.25. Each of the four new indictments concerned a different actress in the film: three concerned different (clothed) minor girls and their dances, and the fourth concerned the adult actress whose breast was exposed—notably, a scene that Babin had previously assured Netflix was not within the "gravamen" of the original indictment and for which Babin declined to see proof of the actress's age.

B

Rather than attempt to defend itself against the four new indictments in state court as it had attempted with the first,[4] Netflix instead pursued relief in federal court. To that end, it filed suit in the Eastern District of Texas under 42 U.S.C. § 1983, seeking an injunction against Babin "from pursuing

---

[4] Netflix explains that filing a pretrial writ of habeas corpus against the four new indictments, as it had done with the first, was not an option because it had conceded in its initial habeas petition that § 43.25 was facially constitutional, and Texas law does not permit as-applied constitutional challenges in pretrial habeas petitions. *See Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim. App. 2010).

any pending indictment against Netflix or seeking to reindict Netflix for any charge related to *Cuties*." Barely a month later, Babin moved for summary judgment, contending that Netflix's request for injunctive relief with respect to the original indictment filed under § 43.262 was moot because he had dismissed it and had also adopted a "policy precluding any Tyler County prosecution under" that section "unless and until constitutional concerns, including those raised by Netflix, are resolved." He additionally argued, as he does now on appeal, that the district court should decline to exercise its jurisdiction under *Younger*.

In response to Babin's motion for summary judgment, Netflix filed an emergency motion to obtain grand-jury discovery, arguing that the discovery was necessary because Babin was pointing to the grand jury as an "independent intermediary" that substantiated his belief that *Cuties* was indeed child pornography. The district court agreed, granted the motion, and ordered Babin to produce the discovery for *in camera* review. Babin then petitioned for mandamus, asking us to direct the district court to withdraw the discovery order. In a per curiam opinion, a different panel of this court denied Babin's mandamus petition but directed the district court to address *Younger* abstention "at the earliest opportunity."[5]

Two months later, the district court did just that. After a seven-hour evidentiary hearing, in which Babin himself testified, the district court issued a detailed, 24-page order finding that he had acted in bad faith and that *Younger* therefore did not apply. It accordingly enjoined Babin "from prosecuting or otherwise pursuing the [four new indictments] against Netflix or from seeking to reindict Netflix under § 43.262 of the Texas Penal Code in connection with the motion picture *Cuties*." Babin appealed.

---

[5] *In re Babin*, No. 22-40306, 2022 WL 1658701, at **3–6 (5th Cir. May 25, 2022) (per curiam).

II

We first address, as the district court did, an issue concerning our subject-matter jurisdiction.[6] Babin argues that Netflix's request for injunctive relief with respect to the first indictment under § 43.262 is moot because he (1) dismissed that indictment, and (2) issued a policy precluding any Tyler County prosecution under § 43.262. The district court determined that neither of these two facts mooted Netflix's request for relief. Reviewing that determination de novo,[7] we agree.

Babin's proffered reasons for mootness fall under the category of voluntary cessation—a familiar but "stringent"[8] exception to the mootness doctrine that we view with a "critical eye."[9] That is because the defendant claiming that his voluntary cessation moots a claim "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."[10] As applied here, Babin must show that it is "absolutely clear" that Netflix's prosecution in Tyler County under § 43.262 for its promotion and streaming of *Cuties* could not reasonably be expected to recur in light of his dismissal of the first indictment and his new non-prosecution policy.

Babin has not carried that "formidable burden" here. He dismissed the first indictment *without* prejudice, so he is free to pursue the charges

---

[6] *See Pervasive Software Inc. v. Lexware GmbH & Co.*, 688 F.3d 214, 231 (5th Cir. 2012) ("The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception." (alteration in original) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999)).

[7] *Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009).

[8] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

[9] *Knox v. SEIU*, 567 U.S. 298, 307 (2012).

[10] *Laidlaw*, 528 U.S. at 190.

under § 43.262 against Netflix again. And that re-prosecution remains a real possibility even in light of Babin's newly issued "policy." As the district court noted, Babin's policy is expressly contingent on, among other possibilities, judicial resolution of § 43.262's constitutionality—an issue that, to date, has not been definitively resolved by either of Texas's two high courts.[11] Such contingencies do not provide us the absolute clarity we would need to dismiss on mootness grounds.

True, we have said before that voluntary cessation by a governmental official like Babin is given "some solicitude."[12] But the presumption of good-faith cessation is defeated when, as here, there is no controlling statement of future intention, the change in conduct is suspiciously timed, and the

---

[11] We note that the Texas Court of Criminal Appeals granted the petition for review in *Lowry* on March 2, 2022, and held argument on October 5, 2022. The parties have not notified us of any further developments in that case, and we have not seen any material updates in the docket on the court's webpage. The fact that the *Lowry* decision remains pending, however, does not further complicate our abstention analysis. In material respects, § 43.262 parallels the U.S. Supreme Court's decision in *Miller v. California*, 413 U.S. 15 (1973), and Babin's occasional references to *Pullman* abstention are unavailing when state law mirrors federal law. *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 n.4 (1984).

[12] *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009). The district court concluded that our precedent affording government officials "some solicitude" for their voluntary cessation is "irreconcilable with recent Supreme Court precedent." *See West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (holding the government defendant to the "heavy" burden of showing mootness based on "voluntary conduct"). If we determine, as a panel, that Supreme Court precedent "implicitly overrules" Fifth Circuit precedent, we may overrule it ourselves. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). We need not make that weighty determination here, however, because we think solicitude is unwarranted for different reasons, as explained above. We will merely make the related and additional point, perhaps for the benefit of a future panel or en banc court, that the "special solicitude" once afforded to states under *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), with respect to justiciability doctrines like standing, seems to also be falling out of favor with the Supreme Court. *See* William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 174–77 (2023).

defendant continues to defend the challenged behavior.[13] Babin's policy (as we have already noted) says little about his future intention, he issued the policy shortly after this federal litigation began, and he continues to defend the constitutionality of § 43.262. For these reasons, Babin cannot carry his heavy burden of showing mootness. Besides, the solicitude ordinarily afforded to government officials like Babin is premised on a "presumption of good faith,"[14] which is precisely the presumption being questioned here.

III

Just as we must ensure the existence of our subject-matter jurisdiction, we must also ensure that exercising it does not offend principles of "Our Federalism."[15] Fidelity to at least one of those principles, as articulated in the canonical case of *Younger v. Harris*,[16] often requires us to abstain from interfering with a pending state criminal proceeding, even when it implicates a defendant's federal constitutional rights.[17] As the Supreme Court recently observed, "many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims."[18] So, to reverse that posture[19] by asking a federal court to exercise its extraordinary

---

[13] *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020).

[14] *Sossamon*, 560 F.3d at 325.

[15] 401 U.S. 37, 41 (1971).

[16] *Id.* at 43–45.

[17] *Bice v. La., Pub. Def. Bd.*, 677 F.3d 712, 720 (5th Cir. 2012).

[18] *Whole Women's Health v. Jackson*, 595 U.S. 30, 49–50 (2021); *see also Kugler v. Helfant*, 421 U.S. 117, 124 (1975) ("The policy of equitable restraint expressed in *Younger v. Harris*, in short, is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights.").

[19] *Compare* John Harrison, Ex parte Young, 60 Stan. L. Rev. 989, 990 (2008) ("Through an anti-suit injunction a party who would be the defendant in a corresponding lawsuit can enforce in equity a legal position that would be a defense at law."), *with* James

equitable powers amidst an ongoing state proceeding, the plaintiff must come with equally extraordinary allegations.[20]

Allegations of "bad faith and harassment," the Supreme Court has said, can usually fit the bill.[21] While states certainly have a legitimate interest in the enforcement of their criminal laws, they have no such interest when the enforcement of those laws is carried out in bad faith. "With respect to the interests of the State," we have said, "it by definition does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or deter the exercise of constitutionally protected rights."[22] Comity, the notion that largely undergirds the relational jurisprudence between state and federal courts, gives way once good faith does. As we put it decades ago, if the "state's legal machinery is being used in bad faith," relying "upon comity is to beg the question."[23]

That said, we are never eager to find bad faith, particularly of public servants.[24] The Supreme Court has recognized the "longstanding

---

E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex parte Young, 72 STAN. L. REV. 1269, 1333 (2020) ("[O]ne can best understand *Ex parte Young*'s assertion of equity power as the outgrowth of a centuries-old common law tradition of judicial control of administrative action . . . .").

[20] *See Hicks v. Miranda*, 422 U.S. 332, 350 (1975) ("Unless we are to trivialize the principles of Younger v. Harris, the federal complaint should have been dismissed on the appellant's motion absent satisfactory proof of those extraordinary circumstances calling into play one of the limited exceptions to the rule of Younger v. Harris and related cases."). *Cf.* Owen M. Fiss, *Dombrowski*, 86 YALE L.J. 1103, 1103 (1977) ("[*Dombrowski*] promised—in its own special way—a new era for the federal injunction.").

[21] *Younger*, 401 U.S. at 53–54.

[22] *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979).

[23] *Sheridan v. Garrison*, 415 F.2d 699, 707 (5th Cir. 1969).

[24] *See Dombrowski v. Pfister*, 380 U.S. 479, 484–85 (1965) ("It is generally to be assumed that state courts and prosecutors will observe constitutional limitations . . . .").

presumption of regularity accorded to prosecutorial decisionmaking,"[25] and has similarly observed that "the Government retains broad discretion as to whom to prosecute."[26] Consistent with those principles, we have made clear that "the 'bad faith' exception [to *Younger* abstention] is narrow and should be granted parsimoniously."[27] Thus, a plaintiff seeking to short-circuit the usual prosecutorial process by invoking the protection of a federal court "may overcome the presumption of abstention" by showing "proven harassment" or that the "prosecutions [were] undertaken by state officials in bad faith without hope of obtaining a valid conviction."[28]

In this case, Netflix alleges that Babin acted in bad faith because (1) he retaliated by seeking four new indictments for Netflix's decision to file a pretrial writ of habeas corpus, and (2) he has no hope of obtaining a valid conviction against Netflix under either § 43.262 or § 43.25 of the Texas Penal Code. Babin rejects each of these allegations and counters that, even if they were true, the grand jury—as an independent intermediary—found probable cause to indict Netflix and thus broke the chain of causation. We address the district court's findings and conclusions regarding bad faith and causality in turn.

A

The district court found that Babin prosecuted Netflix in bad faith— a finding of fact that followed discovery and a seven-hour evidentiary hearing at which Babin testified. Babin contends on appeal that the district court's

---

[25] *Hartman v. Moore*, 547 U.S. 250, 263 (2006).

[26] *Wayte v. United States*, 470 U.S. 598, 607 (1985) (internal quotation marks and citation omitted).

[27] *Hefner v. Alexander*, 779 F.2d 277, 280 (5th Cir. 1985).

[28] *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 87 (5th Cir. 1992) (quoting *Perez v. Ladesma*, 401 U.S. 82, 85 (1971)).

finding in this respect was not only erroneous but *clearly* so—a contention, we are mindful, that must also surmount considerable deference to the district court's credibility determinations.[29] After carefully reviewing the record and the parties' arguments at this preliminary stage in the proceedings, we are not left "with the definite and firm conviction that a mistake has been committed."[30] To the contrary, sufficient evidence supports the district court's findings.

We begin by noting the temporal element overlaying the criminal prosecution of Netflix. After Babin initially charged Netflix and issued a press release about the unprecedented prosecution, the case sat idle for a year. There is no evidence of any effort to move the case along. Then, shortly after Netflix filed its habeas petition, there was a burst of prosecutorial alacrity. The *four* new indictments Babin successfully obtained following Netflix's habeas petition stand in sharp contrast to the relative quietude that Netflix enjoyed after the first indictment was filed. The inflection point—Netflix's assertion of its First Amendment rights—is difficult to overlook. In its briefing, Netflix puts the timing in perspective: Babin waited more than 400 days from the date of the first indictment to multiply the proceedings under a more severe statute—a lull that abruptly ended after Netflix petitioned for

---

[29] *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985); *see also Guzman v. Hacienda Records and Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) ("[T]he clearly erroneous standard of review . . . requires even 'greater deference to the trial court's findings when they are based on determinations of credibility.'" (quoting *Anderson*, 470 U.S. at 574)). In addition to arguing that the district court's findings are clearly erroneous, Babin suggests a couple times in his briefing, without further explanation, that the "clearly erroneous" standard of review may not even apply to the district court's findings. The basis for that contention, however, is not apparent to us, and we can think of no reason ourselves to depart from this settled standard of review.

[30] *Clark v. Mobile Oil Corp.*, 693 F.2d 500, 502 (5th Cir. 1982) (per curiam).

relief. We can begin, then, to trace the abozzo of retaliation from the timeline alone.[31]

It is true, of course, that innocuous reasons could just as well explain the timing of the indictments. After all, Babin initiated the criminal proceedings against Netflix at the height of the COVID-19 pandemic, and we do not pretend to know the demands of the Tyler County criminal docket. Nor, by the same token, do we suggest that animus inevitably underlies any prosecution that does not follow the standard course. But in light of Netflix's other allegations, one could reasonably make a more unfavorable inference from the atypical timeline, as the district court did and was well within its discretion to do.[32]

The *Lowry* decision issued by the Texas First Court of Appeals provides some insight. On the one hand, Babin testified that *Lowry*—again, which declared § 43.262 facially unconstitutional—had no influence on his decision to drop the initial indictment and seek the four new ones against Netflix under a different statute. Yet, on the other hand, Babin now defends his decision to drop the initial indictment because, as he explains, "when faced with a constitutional flaw in a charging document, prosecutors are *supposed* to drop the charges." We respect Babin's explanation and his appeal to the constitutional oath that we all must take, but it is difficult for us to understand it without reference to *Lowry*. If *Lowry* did not influence his decision, precisely what new "constitutional flaw" Babin saw in the first indictment after *Lowry* was decided is unclear from the record. In his deposition, Babin merely explained that he "became aware of . . . some case

---

[31] *Cf. Nobby Lobby*, 970 F.2d at 88 (noting the defendants' responsive timing as probative of bad faith).

[32] *See Harm v. Lake-Harm*, 16 F.4th 450, 455 (5th Cir. 2021) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting *Anderson*, 470 U.S. at 574)).

law" that was cited in Netflix's habeas petition. Which cases those were he did not remember. We also cannot help but see the same tension in Babin's post-lawsuit policy of not prosecuting anyone under § 43.262 until "the Lowry decision has been . . . abrogated." *Lowry* played no role in his decision to drop the initial indictment, Babin submits, yet he subsequently adopted a policy precluding any prosecution under § 43.262 until *Lowry* was abrogated.

These inconsistencies, which the district court noted in its order, and which we can glean from the record, warrant our skepticism in other respects. As we have noted a few times already, Babin multiplied the first indictment into four new ones after Netflix filed its habeas petition. The multiplicity of prosecutions is a hallmark of bad faith under *Younger*,[33] especially when those charges are brought under a more severe criminal statute—a practice we have called "upping the ante."[34] We also cannot ignore the way in which Babin secured *all five* indictments against Netflix. Rather than show the entire film to either of the empaneled grand juries, Babin showed only curated clips and images of the most provocative scenes. We in no way suggest, contra *United States v. Williams*, that prosecutors are constitutionally obliged to show "substantial exculpatory evidence" to the grand jury.[35] But considering all the other allegations against him, Babin's refusal to show the grand jury the

---

[33] *See Younger*, 401 U.S. at 49; *Nobby Lobby*, 970 F.2d at 87–88; *Wilson*, 593 F.2d at 1381. We note that the record reflects some equivocation as to whether Babin intended to try the four indictments separately or at the same time. In his deposition, Babin insisted that he never made any definitive decision on that score, but some of his other statements could be construed as suggestions that he would indeed try them separately. For example, when asked why he decided to have four indictments rather than one four-count indictment, he said that multiple-count indictments that were tried "all together" were easier to reverse on appeal, so he opted for four indictments instead.

[34] *Miracle v. Estelle*, 592 F.2d 1269, 1276–77 (5th Cir. 1979) (citing *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974)).

[35] 504 U.S. 36, 51–55 (1992).

entire film (a mere 96 minutes) gives us reason to question the evenhandedness of his prosecutorial tactics.

Many of Babin's counterarguments to these various charges of bad faith are, in some way or another, tied to his prosecutorial discretion. By way of example, Babin reminds us that his discretion gives him leeway to multiply charges, show the grand jury only inculpatory evidence, and seek more severe penalties under a different statute. We have no trouble accepting any of these arguments, at least in the abstract. But Babin's repeated appeals to prosecutorial discretion really only serve to invite the question rather than answer it. Like any other public official, prosecutors can exercise their discretion in good faith or bad. So to say that a particular decision was merely an exercise of discretion does not bring us any closer to resolving the issue, at least in Babin's favor.

But what does bring us closer (and not in Babin's favor) is the evidence regarding what the parties refer to as the "Jane Doe indictment." The Jane Doe indictment concerned the one nude scene in *Cuties* (a brief flash of a breast) involving an actress who was over the age of eighteen at the time *Cuties* was filmed—a fact the district court confirmed after discovery in the proceedings below. Most tellingly, during his meeting with Netflix after filing the original indictment, Babin expressed no interest in seeing proof that the actress was of age. He instead told Netflix that the "gravamen" of the indictment was the "suggestive way in which the younger, clothed girls (the Cuties) danced." Nevertheless, Babin sought and obtained an indictment against Netflix for the Jane Doe scene more than 400 days later.

What changed Babin's mind in those 400-plus days with respect to Jane Doe is, at best, unclear. Babin's only explanation for this about-face, as he phrased it during the evidentiary hearing, was rather terse and unilluminating: "Visual inspection of the image." The context surrounding

that statement is equally unsatisfying. Babin merely emphasized that he had "absolutely no burden whatsoever" to show that Jane Doe was under eighteen and that he is entitled under the statute to simply look at the image to determine probable cause. In other words, despite identifying no new facts or evidence during the lengthy period between the indictments, despite previously declining an offer of proof from Netflix that the actress was over the age of eighteen, despite assuring Netflix that the original indictment concerned only the "younger, clothed girls," and despite having watched the film already, Babin changed his mind and charged Netflix for the Jane Doe scene in a standalone felony indictment for child pornography for one reason: looking at the scene (again). That the district court concluded Babin had no real hope of obtaining a valid conviction for that scene is, therefore, not altogether surprising.

The picture only becomes bleaker for Babin if we step back and consider the Jane Doe indictment (and the others) in the larger legal context. It is still the case that Babin remains the only prosecutor in the country to have charged Netflix for child pornography based on its promotion and streaming of *Cuties*.[36] Granted, community standards will inevitably differ on whether a particular work depicts "sexual conduct,"[37] and the standards in Babin's community may well be more conservative in this respect—a potential reality that we in no way suggest is misguided or puerile. But Babin's lone prosecution is a hard reality to ignore, if not especially because Netflix is, by all appearances, a mainstream platform with roughly a quarter-

---

[36] Babin has not contested this observation made by both Netflix and the district court, and we assume he would apprise us of any developments that might affect its accuracy.

[37] *Miller v. California*, 413 U.S. 15, 24 (1973).

billion global subscribers.[38] In other words, if Babin is indeed correct that the Jane Doe scene (or any other scene, for that matter) constituted "sexual performance by a child,"[39] that means Netflix streamed child pornography across the nation to millions of viewers, only to face a fractured set of indictments from a single prosecutor in Tyler County. That is theoretically possible, of course, but this anomaly, charitably speaking, only reinforces our view that Babin had no hope of obtaining a valid conviction for the content alleged in the Jane Doe indictment.[40]

Babin, for his part, defends his decision to indict Netflix for the Jane Doe scene by pointing out that he was not "on notice" of Jane Doe's age until after this federal litigation began. And there was nothing unusual about refusing to see proof of Jane Doe's age, Babin continues, because her scene "was not at issue in the original indictment." On this point, Babin is mostly right. He never had definitive proof that Jane Doe was of age when he indicted Netflix a second time (or the third, fourth, and fifth times), and we can take him at his word when he says that he refused to see such proof because she was not part of the original indictment. We fail to see, however,

---

[38] *Cf. United States v. Williams*, 553 U.S. 285, 301 (2008) ("We think it implausible that a reputable distributor of Hollywood movies, such as Amazon.com, believes that one of these films contains *actual* children engaging in *actual or simulated* sex on camera; and even more implausible that Amazon.com would *intend* to make its customers believe such a thing.").

[39] Tex. Penal Code § 43.25.

[40] *Cf. Shaw v. Garrison*, 467 F.2d 113, 116 (5th Cir. 1972) (noting the tenuous connection between the alleged crime and the location of the prosecution). To be clear, we do not suggest that an inference of bad faith should necessarily be drawn from the fact that a prosecution might be unpopular or based on a legal view that is not widely shared. We note the isolated nature of Babin's prosecution merely as yet another reference point in our bad-faith analysis. The Foundation for Individual Rights and Expression, as *amicus curiae*, makes the good and related point that even though *Younger*'s bad-faith exception is narrow, the kinds of facts that can prove bad faith can be wide-ranging.

why any of that matters. Like the district court, we cannot discern any coherent explanation for why Babin had an epiphany about the illegality of the Jane Doe scene more than a year after watching the film. If better reasons support his decision—or any non-conclusory reason at all—he has not pointed us to them. Our independent review of the record has likewise yielded no satisfying answer.

We also note that, whatever precipitated the Jane Doe indictment, Babin does not attempt to defend that indictment on the merits—presumably because, as far as we can tell, there are none. So whether we measure the likelihood of Babin obtaining a valid conviction against Netflix from the time at which he filed the original indictment, the time at which he filed the four new ones, or at any point during the federal proceedings below, there was never any remote chance of Babin obtaining a valid child-pornography conviction against Netflix for a scene involving an adult.[41] And that is true whether we judge Babin's actions under the criminal statute he invoked for the first indictment (§ 43.262) or the one he invoked for next four indictments (§ 43.25(d)). Either way, the law was "clearly inapplicable."[42] The questionable factual underpinnings of the indictment, as we have already outlined above, persuade us that Babin likely knew that from the beginning and proceeded with the indictments anyway.[43]

---

[41] *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 254 (2002) (clarifying that child pornography must contain actual children to be criminalized).

[42] *Universal Amusement Co., Inc. v. Vance*, 559 F.2d 1286, 1295–96 (5th Cir. 1977), *aff'd*, 445 U.S. 308 (1980); *Nobby Lobby*, 970 F.2d at 87.

[43] *Cf. Nobby Lobby*, 970 F.2d at 88 (holding that state officials who seized evidence with knowledge that their seizures were unlawful "raise[d] a strong inference of bad faith"). Relevant here, Babin argues in his briefing that *Nobby Lobby* stands for the proposition that bad faith is present when the "state officials' actions purport to enforce criminal law but reflect *no interest* in the outcome." We take no position on whether that is

All of this, to be sure, is not to suggest that Babin's arguments have no force and that neither we nor the district court can be moved from the conclusions reached in this preliminary posture. Taken one by one, Babin's arguments are well taken. But we agree with the statement of counsel for Netflix made at oral argument that this case looks like a "mosaic" of bad faith, largely pieced together with credibility determinations that only the district court was able to make. However persuasive we might find Babin's arguments individually, we cannot help but step back and conclude that the whole picture does not resemble what we would otherwise presume to be a good-faith prosecution. Thus, finding no clear error in the district court's findings, we do not disturb them.

## B

Before moving to whether Netflix has met the traditional requirements for preliminary injunctive relief, we must first consider a cluster of issues that Babin raises concerning the causal element in this case. Babin specifically contends: (1) the district court did not apply the correct causation standard; (2) his indictments did not "actually chill" Netflix's speech; and (3) the grand juries served as independent intermediaries that broke the chain of causation between his alleged animus and Netflix's injury. We address each of these issues in turn.

*First*, we find no merit to Babin's contention that the district court failed to apply the correct causation standard in its retaliation analysis. While he cites Fifth Circuit precedent rightly applying the "major motivating factor" test,[44] that same precedent also rejected a heightened standard of causation at the preliminary-injunction stage of proceedings. "The standard

---

an accurate description of our precedent but note it only to say that Babin's actions do not fare well even under his own understanding of the law.

[44] *Smith v. Hightower*, 693 F.2d 359, 367 (5th Cir. 1982).

to show likely success on the merits," we have said, "is obviously lower than that for establishing actual success on the merits during the hearing for a permanent injunction."[45] Thus, because we are evaluating only whether Netflix is *likely* to succeed on the merits, our standard is more lax: Netflix need only show that Babin's retaliation was motivated "at least in part" by Netflix's decision to file a habeas petition.[46] The district court applied that standard and found that it was met here.[47]

*Second*, Babin contends that Netflix cannot succeed on its retaliation claim because it has not shown that its speech was actually chilled.[48] Indeed, he says, Netflix continues to stream and promote *Cuties* to this day despite his prosecution. Netflix does not dispute the factual point, and we take no issue with Babin's understanding of what our precedent requires. The problem is that Babin cites cases concerning First Amendment retaliation claims, and we are dealing with retaliation only in the *Younger*-abstention

---

[45] *Id.* at 367 n.19.

[46] At least one other circuit shares this understanding. *See Phelps v. Hamilton*, 59 F.3d 1058, 1067 n.17 (10th Cir. 1995) ("We recognize that some courts have adopted the less exacting "at least in part" test for preliminary injunctions, while maintaining a higher standard for permanent injunctions." (citing *Smith*, 693 F.2d at 367 n.19)).

[47] *Id.* (citing *Wilson*, 593 F.2d at 1387). We briefly note that Babin argues that he could not have retaliated against Netflix for the exercise of its constitutional rights because there is no constitutional right to petition for a writ of habeas corpus in state court. Netflix asserts that this argument is waived (or forfeited), and Babin does not contest that assertion. Whatever the status of this argument before this court, we find it unavailing. Netflix asserted its free-speech rights in its habeas petition, and filing a civil lawsuit to vindicate civil rights is undoubtedly constitutionally protected conduct. *Wilson*, 593 F.2d at 1378. A collection of First Amendment scholars and clinics make a similar point in their amicus brief, arguing that Netflix's habeas petition implicates its right to petition courts for redress of wrongs. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896 (1984).

[48] *See Keenan v. Tejada*, 290 F.3d 252, 259 (5th Cir. 2002) (requiring "some showing that the plaintiffs' exercise of free speech has been curtailed" in a First Amendment retaliation claim).

context.[49] Actual chill is required for the former but not the latter. As we held in *Wilson*, the presumption underlying *Younger* "does not obtain when the *prosecution itself* effects the constitutional violation."[50] And so the prosecution has here. Netflix need not establish an additional constitutional violation, like the chill of free speech, separate and apart from the very constitutional violation that warrants the exercise of our jurisdiction.[51]

*Third*, and finally, we must address an issue that so often arises in retaliatory cases: whether an independent intermediary broke the chain of causation that would otherwise connect the defendant's animus to the plaintiff's injury.[52] Babin's position here is that, even if the allegations of bad faith were true, two grand juries still found probable cause to indict Netflix for child pornography based on its showing of *Cuties*. Therefore, Babin argues, Netflix cannot show that he proceeded "without hope of obtaining a

---

[49] Netflix additionally argues that Count IV of its complaint—a claim for First Amendment retaliation—was not the basis of the district court's injunction. Counsel for Netflix also clarified this point during oral argument, stating that the injunction was based on Count III, a direct First Amendment claim. While the district court vaguely mentioned a "chilling effect" in its order, we do not understand Babin to argue that the district court's injunction rested on First Amendment retaliation—an absence that is also consistent with Netflix's assertion that Babin waived the issue of actual chill.

[50] *Wilson*, 593 F.2d at 1382–83 (citing *Sheridan v. Garrison*, 415 F.2d 699, 706 (5th Cir. 1969)); *see* Fiss, *supra* note 20, at 1114 ("[T]he harm lay in the fact of a bad-faith prosecution rather than its outcome . . . .").

[51] *See Wilson*, 593 F.2d at 1382 ("With respect to the criminal defendant, he is seeking to protect his federal 'right not to be subjected to a bad faith prosecution or a prosecution brought for purposes of harassment, a right that cannot be vindicated by undergoing the prosecution.'" (quoting *Shaw v. Garrison*, 467 F.2d 113, 122 n.11 (5th Cir. 1972) (alterations omitted)); *see also infra* note 67.

[52] *See, e.g.*, *Jennings v. Patton*, 644 F.3d 297, 300–01 (5th Cir. 2011) ("[I]f facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for the Fourth Amendment violation." (internal quotation marks and citation omitted)).

conviction"[53] as a matter of law. This argument has some force, particularly considering that not one but *two* grand juries agreed with Babin and found probable cause to indict Netflix. Our deep respect for the courts of Texas extends to the citizens of that state who nobly carry out their entrusted civic duties. That said, we are not convinced that the independent-intermediary doctrine applies here for at least two reasons.

The first concerns precedent. In the very case establishing the bad-faith exception to *Younger*, the Supreme Court concluded that a federal injunction was warranted for a state prosecution even when criminal indictments had been obtained.[54] The fact of the indictments' existence did not appear to affect the Court's holding that the plaintiffs had plausibly made a claim of bad faith.[55] Granted, the Court's record on bad-faith prosecutions is rather sparse,[56] and the risk of reading too much from a rather procedurally complicated case like *Dombrowski* is real. But as "middle-management circuit

---

[53] *Perez*, 401 U.S. at 85.

[54] *See Dombrowski*, 380 U.S. at 491 (observing that "abstention serves no legitimate purpose where . . . the conduct charged in the indictments is not within the reach of an acceptable limiting construction"). The Court in *Dombrowski* made an additional point about the peculiar timing of the indictments for purposes of determining the applicability of 28 U.S.C. § 2283, *id.* at 484 n.2, but we see no reason why that would change the inference we are making.

[55] *See id.* at 490 (noting that the plaintiffs had "attacked the good faith" of the defendants and that these allegations stated a claim under § 1983); Fiss, *supra* note 20, at 1112 (commenting that the Court in *Dombrowski* ordered the district court to conduct "an evidentiary hearing on the bad-faith harassment issue").

[56] That certiorari has rarely been granted for bad-faith prosecutions under *Younger* is perhaps unsurprising given the rarity of such allegations in the federal courts generally. *See* C. Keith Wingate, *The Bad Faith–Harassment Exception to the Younger Doctrine: Exploring the Empty Universe*, 5 Rev. of Litig. 123, 124 (1996) (noting the "virtually empty universe" of bad-faith claims); Fiss, *supra* note 20, at 1115 (same).

judges,"[57] we are not prepared to deviate from what we can reasonably glean from the U.S. Reports. Additionally, on a more practical level, we think holding otherwise would virtually vitiate the bad-faith exception—at least as applied to prosecutors, who must always seek a determination of probable cause from an independent intermediary, whether it be from a grand jury or magistrate. In our view, a holding of that import would be improper while *Dombrowski* remains good law.[58]

The second concerns Babin's presentation of the evidence. Even if we were to assume, for argument's sake, that the independent-intermediary doctrine applied to bad-faith prosecutions under *Younger*, Babin likely cannot invoke it in this case. That is because we have recognized, in limited circumstances, that the doctrine does not apply when state officials "withhold any relevant information from the" grand jury.[59] As the district court found, Babin did not show the entire film to either of the grand juries. He instead showed only clips and images of the most provocative scenes. Consideration of context is critical when it comes to the exercise of free speech, especially when, as here, its exercise has criminal consequences.[60] So

---

[57] *Whole Woman's Health v. Paxton*, 978 F.3d 896, 920 (2020) (Willett, J., dissenting).

[58] The district court expressed the same doubt, observing that "it is not clear that the independent intermediary doctrine even applies to prosecutors seeking indictments from grand juries."

[59] *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) (citing *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010)).

[60] This is not to suggest that context can necessarily redeem true child pornography. *See New York v. Ferber*, 458 U.S. 747, 761 (1982). But the statute under which Babin initially indicted Netflix, § 43.262, requires consideration of "literary, artistic, political, and scientific value." Tex. Penal Code § 43.262(b)(3). And deliberately choosing to show only the most explicit scenes of a mainstream film, without any indication that showing the entire film is burdensome in some way, gives us further reason to question the means by which the indictments were obtained.

in light of Babin's candid admissions that he did not show the grand juries the entire length of the film (or even the more immediate context of the few scenes he showed), we agree with the district court that the two indictments he obtained likely cannot insulate his actions.

## IV

We must now determine whether the district court, having correctly decided not to abstain under *Younger*, nevertheless abused its discretion by preliminarily enjoining Babin from prosecuting Netflix. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equites tips in his favor, and that an injunction is in the public interest."[61] Much of our discussion thus far has touched indirectly on these equitable considerations, so for many of the same reasons, along with the ones that follow, we agree with the district court that Netflix is entitled to preliminary injunctive relief.

We begin with arguably the most important factor: likelihood of success on the merits.[62] Compared to its discussion of *Younger* abstention, the district court undertook a relatively extensive merits discussion of Netflix's First Amendment claims, accounting for various factors that state and federal courts have used to determine the existence of child pornography.[63] We appreciate and applaud the district court's thoroughness,

---

[61] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[62] *See Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) ("There is authority that the first factor—likelihood of success on the merits—is the most important of the preliminary injunction factors."); *see also* Baude & Bray, *supra* note 12, at 174 n.131 ("[T]he preliminary injunction inquiry is now heavily dominated by the merits . . . .").

[63] *See, e.g.*, *State v. Bolles*, 541 S.W.3d 128, 143–44 (Tex. Crim. App. 2017) (employing the six factors as stated in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986)). At least one member of this court, moreover, has joined other courts in

but we find that no similar treatment is warranted here. The parties dedicate only a few pages of their briefing to this factor, and that may be based on their understanding of *Wilson v. Thompson*, in which we held that a showing of *Younger*'s bad-faith exception was tantamount to a showing of likelihood of success on the merits.[64] So, suffice it to say, because we have already determined that Babin had no hope of obtaining a valid conviction and that his independent-intermediary defense is unlikely to succeed, Netflix has in turn shown likelihood of success on the merits.[65]

We can likewise address the remaining preliminary-injunction factors in short order. Netflix has shown at this stage that it has been subjected to a bad-faith prosecution, an injury we have already deemed "irreparable."[66] Netflix need not establish any further constitutional injury, like the chill of its speech.[67] The balance of equities also favors Netflix. It has an obvious interest

---

expressing dissatisfaction with the *Dost* factors. *United States v. Steen*, 634 F.3d 822, 828–30 (5th Cir. 2011) (Higginbotham, J., concurring); *see also id.* at n.1 (collecting cases).

[64] *See* 593 F.2d at 1384–85 ("In order to show a likelihood of prevailing on the merits, the plaintiff must show the likely applicability of the *Younger* bad faith exception and, what amounts to the same thing in the circumstances of this case, the likely existence of a constitutional violation causally related to the result sought to be enjoined."); *see also id.* at n.17 ("Where the allegation is that the state proceedings . . . were instituted in retaliation for or to deter the exercise of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to prove one is to prove the other.").

[65] Babin recognizes that, under *Wilson*, the merits inquiry for preliminary injunctive relief collapses into the bad-faith inquiry. But he argues that even if that were incorrect, Netflix loses on this factor because (1) two counts in its complaint are moot and (2) Netflix wrongly argues that § 43.25 was facially unconstitutional. We have already rejected Babin's mootness argument, and his second argument mistakes Netflix's as-applied challenge for a facial challenge. *See supra* note 4.

[66] *Fitzgerald v. Peek*, 636 F.2d 943, 944 (5th Cir. 1981) (per curiam).

[67] *See id.* ("A showing of bad faith or harassment is equivalent to a showing of irreparable injury under *Younger*, and irreparable injury independent of the bad faith prosecution need not be established.").

in the continued exercise of its First Amendment rights, and the State has no legitimate interest in a bad-faith prosecution.[68] Our precedent similarly establishes that injunctions protecting First Amendment rights "are always in the public interest."[69] Netflix has therefore shown that it is entitled to preliminary injunctive relief.

V

We end with what we expressed at the beginning. We do not take accusations of prosecutorial bad faith or harassment lightly. Nor, absent extraordinary circumstances, are we inclined to exercise our jurisdiction in a way that interferes with ongoing state-court proceedings. But the injunction is preliminary, our review is deferential, and existing Supreme Court precedent has calibrated the principles of equity and federalism in a way that authorized the district court's intervention. For these reasons, the judgment below must be AFFIRMED.

---

[68] *Wilson*, 593 F.2d at 1383.

[69] *Opulent Life Church v. City of Holy Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).